| | | |
|---|---|---|
| SERGIO VAZQUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:07-CV-130-TLS |
| | ) | |
| ALLEN COUNTY SHERIFF KENNETH | ) | |
| FRIES (Representative Capacity), JEFF | ) | |
| SHIMKUS, MICHAEL SMITH, | ) | |
| GABRIEL FURNISH, MICHAEL | ) | |
| SMOTHERMAN, JEREMY REPAAL, | ) | |
| JAMES BROOKS, and MELANIE | ) | |
| THOMPSON, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Plaintiff, Sergio Vazquez, sued members of the Allen County Sheriff's Department

and the United States Marshal Service after they executed an arrest warrant outside his home on

April 17, 2006. He has also sued the officer who filed a report with the prosecutor's office that

eventually led to the issuance of the arrest warrant. This matter is before the Court on the Motion

for Summary Judgment [ECF No. 78] filed by Allen County Sheriff Kenneth C. Fries, in his

representative capacity, Jeff Shimkus, Michael Smith, Gabriel Furnish, Michael Smotherman,

and Jeremy Repaal (the Sheriff Defendants) on April 28, 2010. For the reasons stated in this

Opinion and Order, the Court grants the Motion.

## BACKGROUND

On April 30, 2007, the Plaintiff filed a Complaint against Allen County Sheriff Kenneth

Fries in his representative capacity and against Officer Jeff Shimkus and other unnamed officers

who participated in arresting him at his home on April 17, 2006. These Defendants filed an Answer and a Notice of Removal of the case to federal court. On April 7, 2008, the Plaintiff filed an Amended Complaint adding Allen County Sheriff Officers Michael Smith, Gabriel Furnish, Michael Smotherman, and Jeremy Repaal in their individual capacities and United States Marshal Deputies James Brooks and Melanie Thompson (the Federal Defendants) in their individual capacities.[1] In his Amended Complaint, the Plaintiff alleges that the Defendants violated his Fourth Amendment rights when they entered his home without a search warrant or permission and seized property within the home. He also alleges that he was falsely arrested and maliciously prosecuted when Officer Shimkus fabricated evidence in an affidavit in support of probable cause, which led to his wrongful arrest for the crime of failing to register as a sex offender. Finally, he alleges that the Defendants used excessive force when they pointed their guns at him and members of his family.

The Sheriff Defendants answered the Amended Complaint and, on April 28, 2010, moved for this case to be summarily decided in their favor pursuant to Federal Rule of Civil Procedure 56(c). On July 16, the Plaintiff filed his Response in Opposition to Defendant's Motion for Summary Judgment [ECF No. 88] and Memorandum in Support of Plaintiff's Response [ECF No. 89]. In connection with their Reply, the Sheriff Defendants filed a Motion to Strike [ECF No. 91] portions of the Plaintiff's Response. The Sheriff Defendants argue that the Plaintiff relies on statements from his own deposition that constitute inadmissible hearsay or are not based on personal knowledge. In the Plaintiff's Response to Defendants' Rule 56 Motion to

---

[1] On November 16, 2010, the Court granted summary judgment in favor of the Federal Defendants.

Strike [ECF No. 95], the Plaintiff "concedes that the statements" that are the subject of the Motion to Strike "do not meet any of the requirements for admissibility as either admissible exceptions to the hearsay rule, or as admissible non-hearsay statements" and "therefore withdraws the portions of [the Plaintiff's] transcript addressed by the Defendants' Motion to Strike." (Pl.'s Resp. 1.)

## STANDARD OF REVIEW

**A.** **Summary Judgment Standard**

The Federal Rules of Civil Procedure state that a court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) & (e)(2); Advisory Committee Notes, 1963 Amendments. The party seeking

summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp*., 200 F.3d 485, 492 (7th Cir. 2000). The court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Shepherd v. Slater Steels Corp*., 168 F.3d 998, 1009 (7th Cir. 1999); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**B.      Motion to Strike**

To be admissible, testimony must concern matters within a deponent's personal knowledge. *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003); *see also* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). A court can find that evidence is inadmissible and not consider it on summary judgment where the court "finds that the witness

could not have actually perceived or observed that which he testifies to." *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999) (quoting *United States v. Sinclair*, 109 F.3d 1527, 1536 (10th Cir. 1997)). The Sheriff Defendants moved to strike the Plaintiff's testimony from pages 24–29 of his deposition because they were speculative and were not based on his personal knowledge, including statements that the police searched inside locked closets and kitchen drawers. The Plaintiff testified that he was not at the house to see the police search these areas, but he heard about it from his wife. The Plaintiff concedes that the testimony is not admissible, and because he cannot come forward with any admissible evidence there is no genuine issue of material fact regarding whether the police opened locked closet doors or opened kitchen drawers.

Likewise, a party may not rely on inadmissible hearsay to oppose a motion for summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The Plaintiff testified that he kept a locked safety box in one of the bedroom closets, and that when he returned home from jail after being bailed out, he found it unlocked on his bed. The Plaintiff states in his deposition that his wife told him that she did not unlock the box, and then uses his wife's statement to infer that, because she did not open the box, one of the Defendants must have opened it. However, the statement cannot be used for the truth of the matter—that the Plaintiff's wife did not open it—because it is hearsay. Fed. R. Evid. 801(c). Mrs. Vazquez's statement, as repeated by her husband, is not a part of the record. In fact, the Plaintiff acknowledges in his Memorandum that Mrs. Vazquez "change[d] [her] story" when she stated during her deposition that she opened the box to get money to pay for the Plaintiff's bail. (Pl. Mem. 5 n.3, ECF No. 89.) The Plaintiff, in response to the Sheriff Defendants' Motion to Strike, concedes that the statement is not admissible. Accordingly, because the Plaintiff has provided no admissible evidence regarding

the safety box there is no genuine issue of fact whether any of the Defendants unlawfully searched the safety box.

## STATEMENT OF FACTS

### A.      Arrest Warrant for Failure to Register as a Sex Offender

On March 25, 1999, the Plaintiff entered a plea of guilty in Allen Superior Court Cause Number 02D04-9803-CF-105 to a charge of Sexual Misconduct with a Minor, a Class D felony.[2] Indiana's sex registration law (Ind. Code § 5-2-12-9) requires offenders who have been convicted of Sexual Misconduct with a Minor (Ind. Code § 35-42-4-9) as a Class A, B, or C felony to register as a sex offender.

On April 25 and June 6, 2005, the Allen County Sheriff's Department Bureau of

_____

[2] Sexual Misconduct with a Minor may be prosecuted as an A, B, C, or D felony depending on the circumstances of the case. *See* Ind. Code § 35-42-4-9. The Defendants state in their Memorandum that the State of Indiana charged the Plaintiff in 1998 with Sexual Misconduct with a Minor, a Class C felony, but that when he pled guilty he did so to the crime of Sexual Misconduct with a Minor, a Class D felony. The Defendants do not designate evidence in support of the statement that the Plaintiff was charged with a Class C felony. Instead, they argue that the "CF" designation within the cause number shows that he was charged with committing a C class felony. The Defendants do not cite any support for the meaning they attach to the naming convention, but Indiana trial courts use a uniform case numbering system, which is outlined in Indiana Administrative Rule 8. Each part of a case number corresponds to information about that case, including the county, court, date filed, and case type. According to Rule 8, the CF designation was used prior to January 1, 2002, to indicate "Criminal Felony." Beginning in 2002, the CF code was no longer used and was replaced with FA, FB, FC, or FD to distinguish between the different classes of felonies. Ind. Admin. Rule 8(B)(3) (July 1, 2010). Thus, the cause number for the Plaintiff's 1999 conviction does not actually specify what level felony the state charged him with committing, only that it was a felony. According to an order of probable cause submitted with the Defendants' Motion for Summary Judgment, an Allen County court found probable cause to issue a warrant for the Plaintiff's arrest for Sexual Misconduct with a Minor, a Class B felony. (Shimkus Aff. Ex. A-12, ECF No. 78-1 at 35.) Upon review of the facts set forth in the Affidavit for Probable Cause, the Order finding probable cause for the arrest warrant, and Indiana Code § 35-42-4-9, the Court concludes that the Plaintiff was most likely charged with committing a Class B felony. In any event, whatever the class of felony charged, it is undisputed that the Plaintiff pled guilty to Sexual Misconduct with a Minor as a Class D felony.

Identification (the Bureau) sent letters to the Plaintiff to advise him that, due to recent revisions of law, he "may be required to register" as a sex offender. (Letters, ECF No. 78-1 at 31, 32.) The letters informed the Plaintiff that he was required to contact the Bureau's office to make arrangements to review any documentation he may have and that the Bureau had also requested documentation from the courts. The June 6 letter advised that it was a second attempt and, that if the Bureau did not receive a response by June 13, it would forward the case to the warrants division. On July 25, the Plaintiff called the Bureau and spoke with an employee who documented their conversation. The Bureau employee recorded that the Plaintiff wanted to speak to his attorney before he registered, and that the Plaintiff stated that he would be to the office on June 13. The Plaintiff's attorney called, talked to a Bureau employee, and said that he would have the Plaintiff go to the Bureau to register. The Plaintiff called again and said that he had talked to his attorney, was aware of his requirement to register, and would come to the Bureau's office on June 14 to register.

During this time, Officer Shimkus was a corporal in the warrants division of the Allen County Sheriff's Department. He provided notice of Indiana's statutory registration obligations to persons who were required by the statute to register as sex offenders. Officer Shimkus would contact individuals at their residences and serve them with a packet of materials that contained relevant details of Indiana's registration requirements. In the course of his duties, Officer Shimkus reviewed the letters that the Bureau had mailed to the Plaintiff and the Bureau employee's notes concerning the Plaintiff's telephone conversation, including his statement that he intended to register.

On December 27, Officer Shimkus went to the Plaintiff's residence and spoke to him.

Officer Shimkus advised the Plaintiff that he was required to register because of his 1999 conviction, told him where to register, and warned him that failure to do so within seven days would result in charges for failing to register, a Class D felony. The Plaintiff indicated that he understood and would register. Officer Shimkus also provided the Plaintiff with the registration packet that contained the standard materials the Allen County Sheriff provided to individuals who were suspected of failing to register. It included the text of Indiana Code § 5-2-12, a list of the registration requirements, including who is defined as an offender required to register, and registration forms.

On January 12, 2006, Officer Shimkus learned that the Plaintiff had not registered and again went to his residence. The Defendant was not at home, but Officer Shimkus spoke to a female about the registration papers that the Plaintiff needed to complete. She replied that she would let the Plaintiff know that Officer Shimkus stopped by. The Plaintiff did not register or otherwise contact the Bureau or Officer Shimkus.

On January 24, Officer Shimkus filed a Report to the Prosecutor which detailed all the events leading up to the Report, including that the Plaintiff had been convicted of one count of Sexual Misconduct with a Minor, a Class C Felony under Allen Superior Court cause number 02D04-9803-CF-105. Included in the materials submitted with the Report was a copy of the Affidavit for Probable Cause in the 1998 case and an order that an Allen Superior Court judge signed after a probable cause hearing. The order indicated that the court found probable cause to arrest the Plaintiff for the crime of Sexual Misconduct with a Minor, a Class B felony. Officer Shimkus requested, based upon the Plaintiff's failure to register or to make further contact with the Bureau, that the Court issue a warrant for the Plaintiff's arrest for the crime of Failure to

Register as a Sex Offender, a Class D felony. He delivered the Report to the Allen County Prosecutor's Office on or about January 26.

On April 14, Allen County Prosecutor Investigator David Helmkamp filed a probable cause affidavit seeking a warrant for the Plaintiff's arrest. He relied on the information provided by Officer Shimkus and the Sheriff's Department, which stated that the Plaintiff's previous conviction was a Class C felony. The Judgment of Conviction, which designated the conviction as a Class D felony, was not provided to Helmkamp, either by the Sheriff's Department or the prosecutor's office. The prosecutor filed Helmkamp's affidavit with the Allen Superior Court and the court issued an arrest warrant on April 17.

**B.      Serving the Warrant**

At nearly 11:00 AM on April 17, 2006, Officers Michael Smith and Gabriel Furnish went to the Plaintiff's home to attempt to serve the arrest warrant. The Plaintiff was not at home. His wife, Ericka Vazquez, answered the door while her two young children stayed in a bedroom upstairs. Mrs. Vazquez does not speak fluent English, so the police used an off-site interpreter who was communicating by radio to tell her they had a warrant for Sergio Vazquez. When asked what happened next, she replied:

> A. They asked for Sergio Vazquez. I did tell him that he lived there. I can't remember if they asked or if they just went in because I was really nervous.
> Q. Is it possible that they asked if they could come into the house?
> A. I think so.
> Q. But you don't remember if they asked or not?
> A. No.
> Q. Would you have allowed them to come into the house if they had asked if they could enter?
> A. Yes, because if you don't know anything, then you can just let them in.
> Q. Did they enter the house?

A. Yes.
Q. Do you think it's more likely than not that they asked if they could come in before they did come in?
A. Yes.

(Ericka Vazquez Dep. at 17, ECF No. 78-4.) She testified that, after she was done talking to the person speaking Spanish to her over the radio, she told the officers that her husband was not in the house, but two of them went upstairs anyway. She also went upstairs and sat with her children on the bed in her bedroom. She described the officers' actions as "[t]hey had the foot somehow and the arm with the gun just like pointing and looking for something" as they entered the bathroom and another bedroom. (*Id.* at 19.) She surmised that perhaps they thought she was lying. She did not know if any of the officers took anything out of a closet where they looked because she was not really paying attention. She testified that they also opened some drawers, but that she was not really paying attention. Mrs. Vazquez stayed upstairs while the officers were in the house and does not know where they looked outside of the bedroom. She could not remember how long the officers stayed in the house, but estimated it was maybe 20 to 30 minutes. She did not notice anything missing or damaged after they left, but she did not check.

After the officers left, Mrs. Vazquez called her husband at work to tell him that the police were looking for him. The Plaintiff left work and came home. After he arrived, Mrs. Vazquez talked to the Plaintiff about turning himself in, they argued, and the Plaintiff went outside, taking his one-year-old son with him. At 12:45 p.m., while the Plaintiff was still outside, Officers Michael Smothermon and Jeremy Repaal arrived at the Plaintiff's home for a second attempt to serve the warrant. They were accompanied by two United States Marshal's Deputies. The

Plaintiff believes that Officer Shimkus was also present to serve the warrant.[3] The Plaintiff was arrested and handcuffed without incident. He then asked the female Marshal, Deputy Thompson, to take his wallet and keys to his wife, who was inside the house, so that she could later bail him out of jail.

Deputy Thompson agreed to deliver the items and entered the house through a side door. At this entrance, a person must go through two doors before entering the living area of the home. After passing through the first door, one can either proceed down to the basement or up stairs through a second door and into the house. Mrs. Vazquez recalled that she was sitting in the living room when a white male officer entered the house, said something in English, and slouched down and pointed his gun slowly back and forth. She then went to the side door and retrieved her crying son from Deputy Thompson. She saw the other Marshal's Deputy, a black male, standing in the doorway by the basement. Mrs. Vazquez does not remember receiving the

---

[3] In his statement of facts, the Plaintiff asserts that Officer Shimkus was present during the second visit to the house on April 17. The Plaintiff cites the Sheriff Defendants' Answers to Plaintiff's First Set of Interrogatories in support of this statement regarding Officer Shimkus, but the Answers to Interrogatories do not support the Plaintiff's assertion. Rather, they identify only Officers Smotherman and Repaal. (Sheriff Defs.' Answers to Pl.'s First Set of Interrogs., ECF No. 89-7.) Officer Shimkus, in his affidavit, states that he did not participate in the service of the arrest warrant on April 17, 2006. (Aff. of Officer Jeff Shimkus ¶ 16, ECF No. 78-1.) The only evidence that contradicts this is the Plaintiff's deposition:

| | |
|---|---|
| Q. | Did you recognize a name or see his name? |
| A. | I believe that was Mr. — what's his name? I want to believe that was Officer Jeff Shimkus. |
| Q. | Did you talk to this officer who may have been Officer Shimkus? |
| A. | Yes. |
| Q. | Had you ever met him before? |
| A. | I want to believe that that was the same detective that brought the package for me to fill out. |
| Q. | When he was there outside your home and you're outside your home, what happened? |
| A. | I don't remember what he said. |

(Sergio Vazquez Dep. 38–39, ECF No. 89-1.) The Plaintiff testified that he thought the white male officer who entered his house after he was arrested was this same officer. (*Id.* at 44) ("I think it was Jeff.").

keys or wallet, but they were later in their typical place on a counter top inside the house.

Regarding what the officers did next, Mrs. Vazquez testified:

> Q. How long did the female officer stay in the house?
> A. Maybe 20, 25 minutes because then I went in the living room and they were still there.
> Q. Did they stay downstairs in the house?
> A. Yeah. I just remember she was standing there. I don't remember.

(Ericka Vazquez Dep. 45, ECF. No. 78-4.)

On May 12, 2006, the Allen County Prosecutor moved to dismiss the charges against the Plaintiff on the ground that he "did not fit the statutory requirements" to mandate registration as a sex offender. (Pl.'s First Amended Compl., ¶ 9.) On May 15, the court dismissed the charge of failing to register as sex offender.

## DISCUSSION

The Plaintiff has narrowed his claims in Response to the Sheriff Defendants' Motion for Summary Judgment. The Plaintiff states that he proceeding only against Officer Shimkus on a state tort false arrest claim and, pursuant to § 1983, unreasonable seizure and malicious prosecution claims.[4] The Plaintiff claims that the Sheriff is liable for false arrest in his representative capacity as the employer of Officer Shimkus. The Plaintiff asserts that Officers Smith and Furnish performed an unreasonable search pursuant to 42 U.S.C. § 1983. The Plaintiff makes no claims against Officers Smotherman or Repaal, and the Court will grant them summary judgment. The Plaintiff also abandons his claim that any of the Sheriff Defendants

---

[4] Although the Plaintiff mentions malicious prosecution as a basis for relief, he does not develop any analysis under such a theory of recovery in his summary judgment brief. Instead, he limits his analysis to common law false arrest and Fourth Amendment unreasonable seizure.

used excessive force.

## A. Claims Against Officer Shimkus for False Arrest and Unreasonable Seizure

The Plaintiff claims that Officer Shimkus committed the common law tort of false arrest and unreasonably seized him in violation of the Fourth Amendment and § 1983 when he applied for an arrest warrant "with reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant; and the statements were material and necessary to the finding of probable cause." (Pl.'s Mem. 10, ECF No. 89.) Because the Plaintiff was arrested pursuant to a facially valid arrest warrant, his claim is derived from the due process clause. *See Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir. 1985) ("When an individual is deprived of his liberty pursuant to a warrant that does not conform to the requirements of the fourth amendment, he is deprived of liberty without due process.") (citing *Baker v. McCollan*, 443 U.S. 137, 143–44 (1979)); *see also Neiman v. Keane*, 232 F.3d 577, 579 (7th Cir. 2000) (holding that a plaintiff cannot base a Fourth Amendment claim on an arrest made under a valid warrant). An officer procuring a warrant is immune from suit for damages unless it can be shown that "a reasonably well-trained officer in the position of the defendant would have known that the action lacks probable cause and that he should not have applied for the warrant." *Neiman*, 232 F.3d at 580. To succeed on this claim, the Plaintiff must establish that Officer Shimkus:

> knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officers' determinations that probable cause existed for the arrests. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). A "reckless disregard for the truth" is demonstrated by showing that the officers entertained serious doubts as to the truth of their statements, had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts they knew would negate probable cause. *See United States v. Whitley*, 249 F.3d 614, 620–21

13

(7th Cir. 2001); *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000).

*Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 742–43 (7th Cir. 2003) (parallel citations omitted).

"Probable cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." *Beauchamp*, 320 F.3d at 743 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). Probable cause need not be based on evidence sufficient to support a conviction or "even a showing that the officer's belief is more likely true than false." *Woods v. City of Chi.*, 234 F.3d 979, 996 (7th Cir. 2000); *see also Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999) (holding that an officer's belief does not have to be correct or even more likely true than false so long as it is reasonable). Probable cause existed in this case if, at the moment when Officer Shimkus sought the warrant for the Plaintiff's arrest, the facts and circumstances within his knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person in believing that he had committed the crime of failing to register. *Id.* (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), and *Neiman*, 232 F.3d at 580). When a court is determining whether information submitted to a judicial officer in support of a warrant application was sufficient to establish probable cause, it looks only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight. *Id.* (citing *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994)). "The test is an objective one and evaluates whether probable cause existed on the facts as they appeared to a reasonable police officer, even if the reasonable belief of that officer is ultimately found to be incorrect." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003). A police officer's probable cause determination depends on the elements of the applicable criminal statute. *Pourghoraishi v. Flying J. Inc.*, 449 F.3d 751, 761

(7th Cir. 2006).

In this case, Officer Shimkus reported that the Plaintiff had previously been convicted of Sexual Misconduct with a Minor, a Class C felony. Under Indiana law, a person convicted of Class C Sexual Misconduct with a Minor is an offender who is required to register. Ind. Code § 5-2-12-9. In actuality, as a result of a guilty plea, the Plaintiff was convicted of Sexual Misconduct with a Minor, a Class D felony. This is the lowest class of felony for Sexual Misconduct with a Minor and the only level that does not trigger the sex offender registration requirements. Officer Shimkus avers in his affidavit that he "believed all of the information [he] provided to the Allen County Prosecutor was true and reliable, at the time that [he] provided that information. [He] did not deliver any information to the prosecutor that [he] thought was false, or misleading." (Shimkus Aff. ¶ 15, ECF No. 78-1.) There is no contrary evidence in the record to suggest that Officer Shimkus deliberately made false statements, intentionally failed to include facts he knew would undermine a finding of probable cause, or entertained serious doubts about the truth of his statement that the Plaintiff had been convicted of a Class C felony. Thus, to succeed on his claim, the Plaintiff must present evidence from which a jury could conclude that Officer Shimkus had obvious reason to doubt the accuracy of his statement that the Plaintiff's underlying conviction triggered the registration requirements, thereby making his statement a reckless disregard of the truth.

The Judgment of Conviction is the only document presented to the Court in connection with the Motion for Summary Judgment that definitively shows that the Plaintiff pleaded guilty to a Class D felony. However, this Judgment was not among the materials Officer Shimkus reviewed and presented to the investigator in the prosecutor's office. Thus, it could not have

been the source of any reason to doubt the accuracy of his statements. The only other court document related to the 1999 conviction that references the class of felony—and which Officer Shimkus submitted to the prosecutor with his report—is the probable cause affidavit and court order finding probable cause to arrest the Plaintiff for Misconduct with a Minor, a Class B felony. Although the Plaintiff is correct that none of the Court documents reviewed by Officer Shimkus designated the charge or the conviction as a Class C felony, none of them suggested that he should have questioned whether the Plaintiff's conviction was for a Class D felony. Rather, the facts appeared to support Officer Shimkus's belief that the Plaintiff was required to register. The Bureau had provided two letters to the Plaintiff informing him that he had to contact the Bureau about his potential obligation to register as a sex offender, and the Plaintiff and his attorney had agreed that the Plaintiff would register. When the Plaintiff did not register, Officer Shimkus went to his home to advise the Plaintiff of his obligation and to provide registration forms. During this conversation, the Plaintiff indicated that he understood his obligation and would register. Officer Shimkus followed up with a second visit to the house. Almost a month after his first visit to the house and nearly seven months after the date the Plaintiff informed Bureau personnel that he would register by, Officer Shimkus filed a Report to the Prosecutor because the Plaintiff still had not registered. During this time, the Plaintiff did not submit any information to show that he was not required to register, despite the fact that he had consulted with an attorney. In addition, because the facts of the underlying Sexual Misconduct charge did not fit the specific circumstances of a Class D Sexual Misconduct charge, *see* Ind. Code § 35-42-4-9(a)(1) & (b)(1), the probable cause affidavit would not have caused Officer Shimkus to suspect that the Plaintiff was not required to register.

The Court concludes that, based on the letters the Bureau sent to the Plaintiff, the generic use of the CF designation in the 1998 cause number, the facts set forth in the affidavit of probable cause supporting the Plaintiff's arrest in 1998 for a Class B felony, and responses from the Plaintiff and his attorney to the Bureau's letters and to Officer Shimkus's visit to the Plaintiff's house, Officer Shimkus did not have obvious reasons to doubt that the Plaintiff was an offender as defined by Indiana's sex registration law. Although the best and most thorough course of action would have been for Officer Shimkus (and others involved in the investigation) to obtain the Judgment of Conviction, nothing in the record before Officer Shimkus would have caused him to doubt that the Judgment would be in accord with the charges, and there is no evidence from which a reasonable jury could conclude that he recklessly disregarded the truth. Officer Shimkus is entitled to qualified immunity and summary judgment on the Plaintiff's § 1983 Fourth Amendment/due process claim.

The Plaintiff's common law cause of action for false arrest is also subject to summary dismissal. "A false arrest requires absence of probable cause." *Row v. Holt*, 864 N.E.2d 1011, 1016 (Ind. 2007). Moreover, in false arrest cases in Indiana, "a standard less stringent than probable cause exists—the good faith of the police officer." *Garrett v. City of Bloomington*, 478 N.E.2d 89, 94 (Ind. Ct. App. 1985). Under this standard, the test "is not whether the arrest was constitutional or unconstitutional, or whether it was made with or without probable cause, but whether the officer believed in good faith that the arrest was made with probable cause and that such belief was reasonable." *Id.* The plaintiff has the burden to prove the officer's lack of good faith or the lack of reasonable cause to believe he was acting constitutionally. *Id.* For the reasons stated above, the Plaintiff has not met this burden.

Because Officer Shimkus is entitled to summary judgment on the Plaintiff's state law tort claim, there can be no vicarious liability associated with the claim. Therefore, Sheriff Fries is entitled to summary judgment on the Plaintiff's state law respondeat superior claim.

**B.      Claims For Unreasonable Search and Seizure**

The Fourth Amendment to the United States Constitution protects the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The sanctity of the home is a central concern of the Fourth Amendment. It is therefore 'a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted)); *Hadley v. Williams*, 368 F.3d 747, 750 (7th Cir. 2004) (stating that, in the absence of consent or compelling circumstances, a warrant is required for entry into the home). An officer may enter a residence to execute a valid arrest warrant if the suspect lives there and the officer has "reason to believe" he is at home. *Payton*, 445 U.S. at 603; *United States v. Jackson*, 576 F.3d 465, 467–68 (7th Cir. 2009). In addition, when police receive consent to enter a home to make an arrest, their entry is reasonable and does not violate the Fourth Amendment. *United States v. Walls*, 225 F.3d 858, 862 (7th Cir. 2000).

"A search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 628 (7th Cir. 2008) (quotation marks omitted). This expectation of privacy is the "hallmark of Fourth Amendment analysis," and it is the government's "unlawful *invasion* of this privacy that gives rise to a Fourth

Amendment violation." *Bentz v. City of Kendallville*, 577 F.3d 776, 782 (7th Cir. 2009) (emphasis in original). One exception to the Fourth Amendment's prohibition on warrantless searches of a person's home gives officers the right, based on the authority of an arrest warrant, to search anywhere in the house where the subject of the warrant may be found. *Maryland v. Buie*, 494 U.S. 325, 330 (1990). After entering a house to make an arrest, officers "may also look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie* at 334. This limited search may be conducted "as a precautionary matter and without probable cause or reasonable suspicion." *Id.* "A search beyond those parameters is justified when there are 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Peals*, 535 F.3d at 627 (citing *Buie*, 494 U.S. at 334). Officers have an interest in ensuring their safety when they lawfully enter a house, which justifies allowing them to verify "that the dwelling does not harbor another person who is dangerous and who unexpectedly could launch an attack." *Leaf v. Shelnutt*, 400 F.3d 1070, 1087 (7th Cir. 2005) (citing *United States v. Burrows*, 48 F.3d 1011, 1015–16 (7th Cir. 1995)) (explaining policy concerns behind the protective sweep exception to the warrant requirement). In determining the reasonableness of a protective sweep, an individual's Fourth Amendment interest, i.e., his expectation of privacy, must be balanced against legitimate governmental interests. *Buie*, 494 U.S. at 331. Whether a protective sweep is reasonable is very fact specific and requires that the circumstances of a particular encounter be assessed carefully in light of the overarching policy concerns articulated in *Buie* and other cases recognize exceptions to the warrant requirement when officer safety is at risk. *Burrows*, 48 F.3d

at 1016. The protective sweep is "not a full search of the premises" and "may extend only to a cursory inspection of those spaces where a person may be found." *Buie*, 494 U.S. at 335.

The Plaintiff argues that the officers who visited the house during the first attempt to execute the search warrant has no reason to believe that the Plaintiff was inside the house because it was a Monday morning when most male adults are at work. The Plaintiff asserts that even if Mrs. Vazquez allowed the police to enter, their ability to search the residence was limited and they did not have authority to search locked closets, kitchen drawers, or envelopes. The Defendants submit that Mrs. Vazquez gave them permission to enter the house, and that there is no evidence that they searched anywhere other than where a person could be found.

The Plaintiff has not presented evidence from which a reasonable jury could conclude that Officers Smith and Furnish violated the Defendant's Fourth Amendment right to be free from unreasonable searches. The Plaintiff's wife believes that the officers asked for permission to enter the house and that she agreed, and there is no contrary evidence in the record to create a genuine issue of material fact whether she gave the officers consent to enter the house. Once they entered, the officers searched in rooms and closets where the Plaintiff could have been hiding. The Plaintiff discovered later that a pay stub had been taken from an envelope, but there is no evidence from which a jury could return a verdict for the nonmoving party on the strength of this evidence alone. The missing pay stub is unremarkable without further evidence pointing to the Defendants as the parties responsible for its absence. Although it is conceivable that the police took the pay stub, it is not reasonable to infer that they did. *See Parker v. Fed. Nat'l Mortg. Ass'n*, 741 F.2d 975, 980 (7th Cir. 1984) ("The district court is not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, but only reasonable

ones."). There is no credible evidence that any of the Defendants opened locked closet doors or searched inside kitchen drawers.[5]

As to the second search, the Plaintiff argues that, although Deputy Thompson had consent to enter the house, the consent did not extend to any other officer because it only takes one person to deliver a wallet, keys, or small child to another person. The Plaintiff argues that Officer Shimkus's[6] entry into the house was not a valid protective sweep because he had no reason to believe that anyone inside the house posed a threat to officer safety.

The officer who entered the house ahead of Deputy Thompson is entitled to qualified immunity unless his conduct violated a clearly established constitutional right. *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009). Here, the facts do not establish that Officer Shimkus violated clearly established law. Officers had just arrested the Plaintiff on the sidewalk outside his house pursuant to a warrant. Immediately upon being arrested and before being removed from the scene, the Plaintiff asked a Deputy Marshal to return items to his wife inside the home. Deputy Thompson agreed and entered the side door. By this time, Deputy Thompson was also carrying the Plaintiff's young, crying child. Members of the task force had been at the house earlier in the day looking for the Plaintiff, but he was not home. This time, the Plaintiff was outside the house when the task force arrived. The officers were justified in believing that at

---

[5] The testimony that the police opened locked doors and looked inside kitchen drawers is contained in that portion of the Plaintiff's deposition that is stricken because it is not based on personal knowledge and contains inadmissible hearsay.

[6] The Court notes that Officer Shimkus avers that he was not present at the house to execute the search warrant and that a dispute exists regarding the identity of this officer. For ease of reference, however, the Court will refer to this officer as Officer Shimkus. The Court does so with the understanding that the analysis pertaining to the constitutionality of the entry into the house has the same applicability regardless of the actual identity of the officer.

least one person, the Plaintiff's wife, was inside the house, and did not have any way of knowing who else may have been inside the house where the Plaintiff was asking Deputy Thompson to enter. None of the officers present during the second visit had been present during the first visit. In addition, the Plaintiff became aware since the first visit that the police were looking for him to execute an arrest warrant.

Consistent with the nature of his legitimate interest in protecting Deputy Thompson, Officer Shimkus entered the house and conducted a sweep of the area where Deputy Thompson had a lawful right to be. He had his gun drawn and was moving it slowly back and forth around the room. It was not unreasonable for Officer Shimkus, as a precautionary matter and without probable cause, to act on the possibility that a person could have been situated inside the house to launch an attack. *Peals v. Terre Haute Police Department*, 535 F.3d at 628, supports this conclusion. In *Peals,* the Seventh Circuit held that officers did not violate the Fourth Amendment when, after arresting the plaintiff in his garage, they looked around the garage and entered the house, an immediately adjoining space in which another person might be located and from which they could launch an attack. 535 F.3d at 628. The officer who entered the house did not need articulable facts to justify his entry even though the police had already taken the plaintiff into custody. *Id.* Likewise, here, the arrest of the Plaintiff was not so far removed, either in time or physical distance from the house, that it would have been apparent to Officer Shimkus that he could not precede Deputy Thompson into the house and minimally intrude on the Plaintiff's privacy "to protect the safety of police officers, who have an interest in ensuring their safety when they lawfully enter a house." *Id.*; *see also United States v. Arch*, 7 F.3d 1300, 1303–04 (7th Cir. 1993) (noting that protective *Buie* search of the immediate arrest site includes

arrests made just outside a home because officers are as much at risk from an unexpected assault on the defendant's doorstep as they might be inside the home). It would not have been reasonable for Deputy Thompson to conduct the search herself and attend to the Plaintiff's child at the same time. There is no admissible evidence that Officer Shimkus or any of the other Defendants searched in areas that would be considered beyond the scope of a protective sweep. Accordingly, Officer Shimkus is entitled to qualified immunity and to judgment as a matter of law on the claim that he violated the Plaintiff's Fourth Amendment rights.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Sheriff Defendants' Motion for Summary Judgment [ECF No. 78] and Motion to Strike [ECF No. 91]. Because there are no remaining claims against any party, the Clerk is directed to enter judgment in favor of the Defendants and against the Plaintiff.

SO ORDERED on November 17, 2010.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT